**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**

| | |
|---|---|
| ROBERT RANDALL THOMAS,<br><br>*Plaintiff*,<br><br>v.<br><br>THE SOUTHERN BAPTIST THEOLOGICAL SEMINARY, a Kentucky non-profit corporation; DOES I-X; *and* ROE CORPORATIONS XI-XX, *inclusive*;<br><br>*Defendants.* | Civil Action No. 3:26-CV-803-CHB<br><br>**COMPLAINT**<br>**(Jury Demanded)** |

COMES NOW, Plaintiff Robert Randall Thomas ("Plaintiff" or "Dr. Thomas"), by and through his undersigned counsel, and hereby complains and alleges against the above-named Defendant, based upon knowledge, information and a reasonable belief derived therefrom, as follows:

**PARTIES**

1. Plaintiff, ROBERT RANDALL THOMAS, is currently a resident of Maryland and, at all relevant times, was a student in the Christian Ethics Ph.D. Program (the "Program") at the Southern Baptist Theological Seminary.

2. Defendant, THE SOUTHERN BAPTIST THEOLOGICAL SEMINARY, is a theological seminary offering graduate education with its principal place of business in Kentucky and is located in Louisville, Jefferson County, Kentucky.

3. Defendants Does I-X, inclusive (collectively, the "Doe Defendants"), are individuals who may be liable for damages with the named Defendants on the allegations set forth

in this Complaint. Plaintiff may seek leave of Court to amend this Complaint to reflect the true names and identities of the Doe Defendants when known.

4. Defendants Roe Corporations XI-XX, inclusive (collectively, the "Roe Defendants"), are corporate entities that may be liable for damages with the named Defendants on the allegations set forth in this Complaint. Plaintiff may seek leave of the Court to amend this Complaint to reflect the true names and identities of the Roe Defendants when known.

5. At all times relevant hereto, and in all their actions described herein, Defendants' actions took place in Louisville, Kentucky.

## VENUE & JURISDICTION

6. Subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331 (federal question) and pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

7. Supplemental jurisdiction over Plaintiff's pendant state law claims is proper pursuant to 28 U.S.C. § 1367(a), as there exist claims arising out of the same transaction and occurrence as his federal claims.

8. Venue is proper in the Western District of Kentucky pursuant to 28 U.S.C. 1391(b) in that the claims arose in this district, and Defendants are located in and/or conduct business in this district.

9. Costs and attorney's fees are sought.

## GENERAL FACTUAL ALLEGATIONS

10. Dr. Thomas is a Black man who is a former ethics instructor, a retired U.S. Army Chaplain (Lieutenant Colonel), a former U.S. Army ethics instructor, and holds advanced degrees from Princeton Theological Seminary and Lutheran Theological Seminary.

11. Dr. Thomas matriculated at The Southern Baptist Theological Seminary ("SBTS") in its Christian Ethics Ph.D. program (the "Program") in January 2019.

12. Dr. Thomas successfully completed all substantive coursework in the Program, as well as passed his comprehensive exams, intensive written exams testing his knowledge of the Program material.

13. Following completion of the comprehensive exams, students in the Program begin work on their dissertation. This work begins with drafting a prospectus, which is an outline of their dissertation topic, planned research and intended argument.

14. Dr. Thomas' dissertation topic, "*A Christian Ethical Analysis of Interest Convergence in Under-Resourced Black Urban Schools*," focused on interest convergence, one of the tenets of critical race theory ("CRT").

15. During his work towards his dissertation, SBTS assigned Dr. Thomas to Dr. Timothy Paul Jones as an advisor.

16. Dr. Jones informed Dr. Thomas that he didn't have sufficient knowledge of CRT to advise Dr. Thomas.

17. SBTS then assigned Dr. Bradley Green, a visiting professor, to serve as Dr. Thomas' advisor.

18. During the period Dr. Green was Dr. Thomas' advisor, Dr. Green told Dr. Thomas that Dr. Green had "no doubt the vestiges of racism still linger within [him] because [he] was raised in Tennessee."

19. As part of his analysis in preparation for his dissertation prospectus, Dr. Thomas had to provide the historical backdrop of the Evangelical Church, which demonstrated a history of racism within that church where Black individuals were referred to as "subhuman" and "apes" and

where members of the Evangelical Church in the 1800s and 1900s strongly believed Black individuals needed to be segregated from White individuals.

20. When Dr. Green learned of Dr. Thomas' intent to include this information, Dr. Green asked if that was necessary, stating such views were "on the fringe," indicating he did not want Dr. Thomas to include that information.

21. Dr. Thomas responded that SBTS itself had a history of championing White supremacy. The background information regarding racism within the church remained in Dr. Thomas' work, including his prospectus.

22. Upon information and belief, Dr. Green shared Dr. Thomas' comments with other SBTS faculty.

23. Following these exchanges, Dr. Green's tone towards and overall treatment of Dr. Thomas changed drastically.

24. Dr. Thomas submitted a prospectus and subsequently submitted the initial chapter of his dissertation to Dr. Green.

25. Program expectations provide that advisors will respond to students with feedback in a timely manner, within no more than three weeks, and other students at SBTS at the same time as Dr. Thomas were receiving feedback within a week, or just a few days.

26. Dr. Green repeatedly failed to provide Dr. Thomas with comments within the expected timeframe, at one point taking six weeks to provide comments on Dr. Thomas' initial chapter.

27. Dr. Green also had multiple people evaluate the first chapter of Dr. Thomas' dissertation, without Dr. Thomas' knowledge, in a departure from typical practice. Dr. Thomas was not provided with any feedback from those reviews.

28. Following the initial prospectus stage, Dr. Green abruptly withdrew as Dr. Thomas' advisor.

29. A week later, SBTS suddenly informed Dr. Thomas he was dismissed from the Program.

30. Dr. Thomas had successfully completed the Program requirements up until that point.

31. Following intervention from Dr. Thomas' counsel, SBTS readmitted Dr. Thomas.

32. SBTS then assigned Dr. Jones and Dr. John David Trentham to serve as Dr. Thomas' co-advisor. Neither Dr. Jones nor Dr. Trentham had a Ph.D. in Christian Ethics or degrees falling within the mainstream of theological scholarship, as would be necessary to adequately advise Dr. Thomas.

33. On February 28, 2025, Dr. Thomas submitted a draft dissertation prospectus to his new advisors, Dr. Jones and Dr. Trentham.

34. On March 13, 2025, Dr. Jones and Dr. Trentham returned revisions to Dr. Thomas.

35. Based on the feedback, Dr. Thomas proposed a narrowing of his dissertation topic to Dr. Jones.

36. On April 2, 2025, Dr. Jones expressly approved Dr. Thomas' narrowed topic and instructed Dr. Thomas to proceed with the drafting revised prospectus.

37. Dr. Thomas did so and submitted his revised prospectus on April 14, 2025.

38. Typically, advisors work closely with students to develop a dissertation prospectus.

39. The Program expects advisors to review and approve prospectuses prior to their presentation to a committee for final approval, indicating the prospectus was ready for assessment, after which the student sends the prospectus to his dissertation committee for further review.

40. However, Dr. Jones did not evaluate the revised prospectus draft, or provide feedback, and instead immediately forwarded it to the Research Doctoral Studies Office for the assembly of a committee and for scheduling a prospectus hearing.

41. Students in the Program work with their advisors to jointly determine who should sit on their dissertation committee.

42. STBS did not provide Dr. Thomas the opportunity to choose committee members, or even be involved in their selection.

43. On May 12, 2025, Dr. Thomas appeared by Zoom before the dissertation committee to discuss his prospectus.

44. Only one member of the committee, Dr. Andrew Walker, had a Ph.D. in Christian Ethics. Dr. Thomas previously had asked Dr. Walker to serve on his dissertation committee, and Dr. Walker had previously declined, stating he had insufficient knowledge in the area of Dr. Thomas' dissertation.

45. The next day, on May 13, 2025, Dr. Jones informed Dr. Thomas that the committee had issued him a failing grade.

46. Dr. Jones further informed Dr. Thomas that his prospectus would be sent to an outside evaluator, whose assessment would determine Dr. Thomas' continued status in the Program.

47. Prior to this point, SBTS had not informed Dr. Thomas that the prospectus evaluation process would be used to determine if Dr. Thomas remained in the Program.

48. Further, the SBTS Ph.D. Student Manual provides that review by an outside evaluator occurs only at the defense of dissertation phase, after research and writing is completed.

49. In the prospectus review process, when the student's prospectus is not approved, the student is given the opportunity to make necessary revisions. Program dismissal is not identified as a potential outcome of an initial determination that the prospectus is not approved.

50. SBTS asked the outside evaluator to assess Dr. Thomas' prospectus, the outline of research not yet conducted, by using the SBTS rubric for evaluating a student's oral defense of a completed dissertation.

51. The outside evaluator passed Dr. Thomas' prospectus in two of three categories on the dissertation rubric, but failed him in the third category, Communication of Results. The Communication of Results section of the rubric required a rating of the quality of the student's communication of the results of his dissertation research *after* it has been completed.

52. Program requirements for a prospectus and a dissertation are different.

53. Prospectuses are not required to include communication of the results of completed research because, by definition, a prospectus is submitted well before the research intended to be part of the dissertation is completed.

54. Based on Dr. Thomas' failure of a category that did not apply to a prospectus, STBS assigned Dr. Thomas an overall failing grade on his prospectus. Dr. Thomas was not given the opportunity to make revisions to his prospectus and submit it for another defense.

55. On June 6, 2025, Dr. Gregory Wills, Director of the Research Doctoral Studies Office, sent a letter to Dr. Thomas notifying him that he was being removed from the Program.

56. This letter indicated that the dismissal was based on the committee's determination that Dr. Thomas had failed, as confirmed by the external reviewing, and the recommendation of Dr. Jones that Dr. Thomas therefore be dismissed.

57. Dr. Jones' recommendation to Dr. Wills identified multiple revisions that he believed Dr. Thomas' prospectus required, but that he had not previously communicated to Dr. Thomas or that Dr. Thomas had otherwise not had an opportunity to address.

58. Despite his removal from the Program, Dr. Thomas learned from Dr. Wills that he could transfer to the Doctor of Education (Ed.D.) program or accept a Master of Theology (Th.M.) degree based on his completed work in the Program, indicating that SBTS had judged Dr. Thomas' academic work to be acceptable for a graduate degree.

59. SBTS's Ed.D. program is also doctorate program, culminating in a significant written product in the form of a thesis involving academic research and analysis.

60. Dr. Thomas informed Dr. Wills that he had not been advised that Dr. Jones would send his prospectus draft to the committee without evaluating it first, that this deviated from the typical process, and that he specifically was requesting an opportunity to address the necessary revisions Dr. Jones had noted for the first time in his recommendation to Dr. Wills.

61. Dr. Thomas filed an appeal through SBTS's Grievance Committee.

62. On September 5, 2025, Dr. Thomas met with the Grievance Committee by Zoom.

63. Two weeks later, on September 19, 2025, Dr. Thomas received notice that his grievance had been denied and he would be dismissed from the Christian Ethics Ph.D. Program.

64. Dr. Thomas thereafter appealed his dismissal to the provost, Dr. Paul Akin.

65. On October 7, 2025, Dr. Thomas received Dr. Akin's final letter upholding the Grievance Committee's decision. Dr. Akin's letter indicated he did not newly review the decision but instead based his decision on his determination that Dr. Thomas' submission did not provide sufficient new evidence or documentation to justify overturning the committee.

66. The letter informed Dr. Thomas that the appeals process was complete, and SBTS considered the case closed.

67. SBTS never placed Dr. Thomas on probation or advised him of a failure to make satisfactory academic progress prior to his dismissal from the Program.

## FIRST CAUSE OF ACTION

***Title VI of the Civil Rights Act of 1964,***
***42 U.S.C. § 2000d***
**Against All Defendants**

68. Each of the allegations set forth in paragraphs 1 through 67, inclusive, are hereby incorporated by this reference as if realleged fully herein.

69. Title VI of the Civil Rights Act of 1964, 78 Stat. 252, as amended, 42 U.S.C. § 2000d *et seq.*, provides in § 601 that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" receiving federal financial assistance.

70. SBTS accepts G.I. Bill benefits from the U.S. Department of Veterans Affairs, including benefits under Chapter 30, Chapter 31, Chapter 33, Chapter 35, and Chapter 1606.

71. Dr. Thomas is a Black man and therefore a member of a protected class.

72. SBTS treated Dr. Thomas less favorably because of his race and the racial focus of his dissertation when:

a. Dr. Green, a White male faculty member, told Dr. Thomas that he (Dr. Green) had "no doubt the vestiges of racism still linger within [him] because [he] was raised in Tennessee;"

b. Dr. Green sought to dissuade Dr. Thomas from including historically accurate information in his dissertation regarding the history of racism within the Evangelical Church;

c. Dr. Green negatively changed his treatment towards Dr. Thomas when Dr. Thomas noted that SBTS historically had championed White supremacy;

d. Dr. Green withdrew as Dr. Thomas' advisor;

e. Following Dr. Thomas' negative interactions with Dr. Green related to race, which, on information and belief, Dr. Green shared with other faculty, SBTS treated Dr. Thomas less favorably based on his race, including by dismissing his without warning and against SBTS procedures;

f. Upon Dr. Thomas' reinstatement, SBTS assigned Dr. Thomas advisors who did not have a degree in his concentration or any academic background in his dissertation topic;

g. Dr. Jones and Dr. Trentham, also White males, failed to provide Dr. Thomas with the feedback required by the Program for his prospectus and forwarded the prospectus for review prior to approval or discussion with Dr. Thomas regarding any concerns;

h. SBTS assigned Dr. Thomas a dissertation committee without Dr. Thomas' input, deviating from Program procedures, and further included on the committee a faculty member who had previously stated he was unqualified to serve on the committee due to his lack of knowledge in the area in which Dr. Thomas was proposing for his dissertation;

i. SBTS sent Dr. Thomas' prospectus to an outside reviewer in a deviation from SBTS procedures;

j. SBTS required the external reviewer to utilize a rubric meant only for a student's oral defense of a completed dissertation in evaluating Dr. Thomas' prospectus;

k. SBTS dismissed Dr. Thomas following a failure of the "Communication of Results" category on the rubric that did not and could not have applied to a prospectus;

l. SBTS dismissed Dr. Thomas without providing an opportunity for Dr. Thomas to make any necessary revisions to his prospectus, in deviation from SBTS procedures;

73. As a direct and proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer irreparable harm, injury, and damages; including, but not limited to, monetary damages, time and resources, and lost career opportunities and earning capacity.

74. Plaintiff is entitled to injunctive relief requiring SBTS to reinstate him into the Christian Ethics Ph.D. Program, remove from his academic and student records any and all notations about and references to his dismissal, and permit him to complete the requirements of the Program free from discrimination and retaliation.

75. It has been necessary for Plaintiff to obtain the services of an attorney to prosecute this action, and Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

## **SECOND CAUSE OF ACTION**

***Breach of Contract***
**Against All Defendants**

76. Each of the allegations set forth in paragraphs 1 through 67, inclusive, are hereby incorporated by this reference as if realleged fully herein.

77. Kentucky law recognizes that the relationship between a student and a private university is contractual in nature and the terms of the implied contract include the rights and obligations of each party contained in the university's handbook, bulletins, catalogues, policies or other material made available to the student.

78. SBTS publishes a Ph.D. Student Manual.

79. The SBTS Ph.D. Student Manual in place for the 2018-2019 school year when Dr. Thomas matriculated into SBTS set forth specific procedures for the submission and evaluation of a prospectus.

80. Specifically, the Ph.D. Student Manual in Section 3.2.11.1, Prospectus Defense and Approval provided that a student was first to send the prospectus to their supervisor (the faculty serving as their advisor during the dissertation process) seeking permission to defend.

81. Only after the supervisor approved the prospectus would the student then submit the prospectus to their dissertation committee.

82. Under the Ph.D. Student Manual, "[o]nce the student and supervisor have determined a topic for the dissertation, *together they should decide* who would be best to serve on the dissertation committee." (Emphasis added).

83. Following committee review of the prospectus, students were required, and permitted the opportunity, to make necessary revisions suggested by the committee.

84. The Ph.D. Student Manual provided that a prospectus must include:

a. A clear thesis statement/Research Question

b. A summary of the history of research

c. A rationale for the significance of the thesis for the student's field

d. A proposed detailed outline for the dissertation's argument

e. A timeline for completion of the dissertation

85. The Ph.D. Student Manual provided for the review by an external reader only for a completed dissertation. There was no provision for the review of a prospectus by an external reader or action, including dismissal, based on an external readers' assessment of a student's prospectus.

86. The Ph.D. Student Manual provided a rubric for the oral defense of a dissertation, after the full completion of the dissertation, based on three categories, of which the third is Effective Communication of Results. That rubric was specifically for the evaluation of completed dissertations, not prospectuses.

87. While the Ph.D. Student Manual identified effective dismissal from the Ph.D. program as a potential outcome of the dissertation defense and committee evaluation process, it did not identify dismissal as a potential outcome from the prospectus committee evaluation process.

88. At the time Dr. Thomas sent his prospectus draft to Dr. Jones, SBTS also maintained a Prospectus Defense Process webpage for students to serve as a resource for prospectus requirements. As set forth on that webpage, the requirements for a prospectus included a thesis section with a clear research question and thesis statement, a summary of methods to be utilized, a survey of relevant literature, explanation of the significance of the proposed dissertation to the field; an explanation of the argument intended to be made, information regarding the completion timeline, a proposed table of contents for the dissertation and a bibliography. There was no requirement for any communication of results.

89. On information and belief, all Ph.D. Student Manuals applicable to Dr. Thomas during his time in the Program contained provisions consistent with those in the 2018-2019 Ph.D. Student Manual, and similarly provided that there was no requirement for effective communication of results—which were not yet complete—in a prospectus; the student's advisor would review and approve of a prospectus prior to submission to the dissertation committee with the student having opportunities for revision as needed; the student would be involved in the selection of the dissertation committee; the student would have the opportunity to address any necessary revisions identified by the committee; dismissal was not identified as potential outcome from a prospectus evaluation; external reviews were utilized only for dissertation evaluation; and the three category evaluation rubrics, including the Effective Communication of Results, was utilized solely for the evaluation of the defense of the dissertation.

90. In setting forth specific Program requirements, including required components of the prospectus, the supervisor review and approval process, and the evaluation process, SBTS clearly communicated that, outside of disciplinary matters, its decisions regarding a student's advancement and enrollment in the Program would be based on academic performance, in accordance with the stated procedures and evaluative criteria specified, including the opportunities to respond to feedback.

91. Dr. Thomas performed his obligations under the contract with Defendant STBS in full, including full payment of tuition.

92. SBTS breached its contract with Dr. Thomas when:

a. SBTS dismissed Dr. Thomas following Dr. Thomas' negative interactions with Dr. Green related to race, without warning and against SBTS procedures;

b. SBTS failed to provide Dr. Thomas with advisors with doctorate degrees in his subject area;

c. Dr. Jones and Dr. Trentham failed to provide Dr. Thomas with the feedback required by the Program for his prospectus and forwarded the prospectus for review prior to approval or discussion with Dr. Thomas regarding any concerns;

d. SBTS assigned Dr. Thomas a dissertation committee without Dr. Thomas' input, deviating from Program procedures, and further included on the committee a faculty member who had previously stated he was unqualified to serve on the committee due to his lack of knowledge in the area in which Dr. Thomas was proposing for his dissertation;

e. SBTS sent Dr. Thomas' prospectus to an outside reviewer in a deviation from SBTS procedures;

f. SBTS required the external reviewer to utilize a rubric meant only for a student's oral defense of a completed dissertation in evaluating Dr. Thomas' prospectus;

g. SBTS dismissed Dr. Thomas following a failure of the "Communication of Results" category on the rubric which did not and could not have applied to a prospectus;

h. SBTS dismissed Dr. Thomas without providing an opportunity for Dr. Thomas to make any necessary revisions to his prospectus, in deviation from SBTS procedures; and

i. SBTS based its decisions and actions regarding Dr. Thomas' performance on his race and the race related subject matter of his dissertation and his statements regarding SBTS and the church's history of racism.

93. As a direct and proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer irreparable harm, injury, and damages; including, but not limited to, monetary damages, time and resources, and lost career opportunities and earning capacity.

94. It has been necessary for Plaintiff to obtain the services of an attorney to prosecute this action, and Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Dr. Thomas demands a jury trial for all issues in this matter.

## RELIEF REQUESTED

WHEREFORE, Dr. Thomas prays that this Honorable Court enter judgment in his favor, and against the Defendants, jointly and severally: (a) for Injunctive Relief to reinstate Dr. Thomas as a student in good standing in Southern Baptist Theological Seminary's Ph.D. Program; (b) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) to be determined at trial; (c) for interest; (d) together with the costs and disbursements

///

///

of this action and such other attorneys' fees, pursuant to 42 U.S.C. § 1988; and (e) further relief as justice requires.

DATED this 6th day of October, 2026.

Respectfully Submitted,

**THE BACH LAW FIRM, LLC**

*/s/ Jason J. Bach*
Jason J. Bach
7881 W. Charleston Blvd., Suite 165
Las Vegas, Nevada 89148
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email: jbach@bachlawfirm.com
*Attorney for Plaintiff*